UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



- - - - - - - - - - - - - - - - - - - - - - - - - -

BRIAN ARYAI,

               Plaintiff,

      -against-

FORFEITURE SUPPORT ASSOCIATES, LLC,
UNITED STATES MARSHALS SERVICE, and
EBEN MORALES, in his individual and
official capacities,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - -

10 Civ. 8952 (LAP)

MEMORANDUM AND ORDER

LORETTA A. PRESKA, Chief United States District Judge:

      This motion by Defendants United States Marshals
Service ("USMS") and Eben Morales ("Morales") (collectively, the
"Moving Defendants") to dismiss the claims of Plaintiff Brian
Aryai ("Plaintiff") presents, inter alia, two questions of first
impression in this district: (1) whether the amended
whistleblower provision of the False Claims Act ("FCA") provides
a cause of action against individual defendants; and (2) whether
to recognize an action pursuant to Bivens v. Six Unknown Federal
Narcotics Agents, 403 U.S. 388 (1971), on behalf of an employee
of a government contractor who experiences retaliation for
engaging in speech protected by the First Amendment.  For the
reasons set forth below, the Court answers both questions in the

negative and grants the Moving Defendants' motion to dismiss
[Dkt. No. 15].[1]

I.   BACKGROUND

The Court takes as true the following factual
allegations in the amended complaint and draws all reasonable
inferences in favor of Plaintiff.  See Goldstein v. Pataki, 516
F.3d 50, 56 (2d Cir. 2008).

Plaintiff was employed as a Senior Forfeiture
Financial Specialist by Forfeiture Support Associates, LLC
("FSA"), a company that "provides staffing and support solutions
to government agencies."  (Am. Compl. ¶¶ 4-5.)  One of those
agencies is USMS, an agency responsible for, as relevant here,
managing and disposing forfeited properties the Government has
seized as proceeds of criminal activities.  (Id. ¶ 6.)  USMS
performs that function pursuant to the Asset Forfeiture Program
("AFP") of the Department of Justice.  (Id.)  At all relevant
times, Morales served as Acting Assistant Director of the AFP.
(Id. ¶ 7.)  One division within the AFP is the Complex Assets

---

[1] The Court has considered the following submissions in
connection with the instant motion: Memorandum of Law in Support
of Defendants' Motion to Dismiss ("Defs. Mem."); Declaration of
Gerald M. Auerbach in Support of Defendants' Motion to Dismiss,
dated April 7, 2011 ("Auerbach Decl."); Declaration of David
Bober in Support of Defendants' Motion to Dismiss, dated April
11, 2011 ("Bober Decl."); Plaintiff's Memorandum of Law in
Opposition to Defendants' Motion to Dismiss the Amended
Complaint ("Pl. Opp."); Reply Memorandum of Law in Support of
Defendants' Motion to Dismiss ("Defs. Reply").

Group ("CAG"), "which is responsible for the disposition of seized and forfeited financial instruments, businesses, majority and minority business interests and substantial real estate." (Id. ¶ 11.)

A core aspect of FSA's business is providing support services to the AFP pursuant to an Asset Forfeiture Support Contract ("AFSC"). (Id. ¶¶ 4-5.) "Pursuant to the [AFSC], the Government purportedly has the contractual right to require FSA to remove any of its employees from performance under the contract." (Id. ¶ 56.) "However, in instances where the removal of an employee is for substandard performance or behavior negatively impacting delivery of services, the [AFSC] provides FSA an opportunity to resolve the situation so as to allow the employee to remain on the contract." (Id. ¶ 57.)

Plaintiff began working with the AFP in New York City on October 13, 2009. (Id. ¶¶ 8-9.) Plaintiff claims that, in early 2010, he discovered that CAG Program Manager Len Briskman ("Briskman") "would unilaterally place a substantially low monetary value on a particular complex asset and then proceed to negotiate with and select buyers for the asset without providing any public notice." (Id. ¶¶ 12-14.) According to Plaintiff, Briskman told him that "he often found buyers through his 'business contacts'" and that "there was no public notice mechanism in place at the CAG for soliciting buyers for minority

interests in privately held companies." (<u>Id.</u> ¶¶ 15-16.)
Believing this protocol "ran the significant risk of defrauding
the United States government," on February 19, 2010, Plaintiff
met with Pam Bass ("Bass"), the program manager of Internal
Controls at USMS, and Yolanda Lopez ("Lopez"), his supervisor at
FSA, to discuss his concerns. (<u>Id.</u> ¶¶ 17-18.)  Either at this
meeting or sometime thereafter, Plaintiff suggested Morales
should be informed about what he had discovered regarding
Briskman. (<u>Id.</u> ¶ 21.)

        In early March 2010, Plaintiff was working on the
disposition of a "minority held interest in a private equity
position known as the 'Delta Fund.'" (<u>Id.</u> ¶ 22.)  During the
course of his work, Plaintiff discovered that Briskman had set a
sale price for the asset well below fair market value and had
not sought multiple buyers in the open market. (<u>Id.</u>)  Plaintiff
contacted Lopez and Barbara Ward ("Ward"), an Assistant United
States Attorney for the Southern District of New York, regarding
his concerns about Briskman and the Delta Fund pricing. (<u>Id.</u>
¶¶ 23, 29.)  On March 5, 2010, Lopez sent Plaintiff an e-mail
with the following language: "Be careful.  Len is the Senior
[United States Marshal] for Business and Complex assets.  We are
contractors and must cover for him, present a united front.  US
Attorneys should not get the impression that we are in differing
levels." (<u>Id.</u> ¶ 24.)  Subsequently, on March 24, 2010,

Plaintiff was transferred to the CAG to work directly under Briskman.  (Id. ¶ 25.)  Plaintiff does not specify who was responsible for this transfer.

Shortly thereafter, Plaintiff attempted to connect with Briskman on the professional networking website, LinkedIn.  (Id. ¶ 26.)  Plaintiff claims Briskman listed himself on the website as CEO of Asset Valuation Advisors, LLC, which "held itself out as a business with experience in the disposition of distressed assets," including assets related to forfeiture proceedings over which USMS presided.  (Id. ¶¶ 26-27.)  Plaintiff reported these findings to Ward, and "it was agreed that Plaintiff's findings would be confidentially referred to the Office of the Inspector General" ("OIG").  (Id. ¶¶ 29, 31.)  Despite the purported agreement concerning confidentiality, Plaintiff claims that in response to Morales's contacting Ward regarding the OIG referral, Ward told Morales Plaintiff had brought the matter to light.  (Id. ¶¶ 32-33.)

On April 8, 2010, Plaintiff received several e-mails from Bass via FSA Regional Director William Wolf ("Wolf") demanding that he answer by the close of business several questions posed by Morales about Plaintiff's research into and subsequent reporting of Briskman's activities.  (Id. ¶¶ 37-39.)  Plaintiff did so and claims that his response was forwarded to Morales.  (Id. ¶¶ 40-41.)  Shortly thereafter, Plaintiff

received a call from Wolf to the effect that Morales had
canceled Plaintiff's scheduled trip to Miami and ordered
Plaintiff and Wolf to appear at Morales's office in Washington,
D.C., on April 12, 2010. (Id. ¶ 41.)  When Plaintiff and Wolf
met with Morales, "Morales expressed extreme anger and agitation
with Plaintiff for having disclosed Briskman's conduct" and
"angrily told Plaintiff that Briskman was part of the 'family'
and that Plaintiff should have never looked into his
activities." (Id. ¶¶ 42-43.)  Morales also purportedly told
Plaintiff, "[I]nstead of letting the [United States Attorney's
Office] find out about this, you should have come to me and I
would have quietly forced [Briskman] into retirement . . . ."
(Id. ¶ 44.)  Plaintiff claims Morales then threatened him with
the following: "[Y]ou are talking yourself out of a job; I am
not sure if there is a place for you here after this; I can get
rid of you any time." (Id. ¶ 45.)

        Plaintiff alleges that, after this meeting, Morales
"subjected [him] to micromanagement and a pattern of harassment
and abuse." (Id. ¶ 46.)  For example, Plaintiff alleges
"Morales initiated a sham investigation with the Contracting
Officer to try and establish that Plaintiff was not in
compliance with the [AFSC]." (Id. ¶ 47.)  On May 22, 2010, Wolf
instructed Plaintiff to begin reporting to USMS in Newark, New
Jersey. (Id. ¶ 50.)  "Wolf provided no explanation as to why

Plaintiff was being transferred." (Id.)  Plaintiff accepted the
assignment "as a temporary measure[] and under protest," but not
before sending an e-mail to Wolf that he considered such actions
"as retaliatory and punitive in nature in response to my actions
in disclosing suspected fraud and criminal activities as well as
for reporting suspected policy violations." (Id. ¶ 51.)  In May
and June 2010, Plaintiff's counsel sent several letters to the
same effect to the general counsel for USMS and Wolf. (Id.
¶ 52.)

On June 16, 2010, Wolf told Plaintiff that Morales had
ordered him to "remove [Plaintiff] from performing under the
[AFSC]." (Id. ¶ 53.)  "When Plaintiff inquired as to why be was
being removed, Wolf informed him that he was instructed by
Morales to remove Plaintiff from the [AFSC] because, according
to Wolf, 'you know he has been after you ever since you reported
[Briskman].'" (Id. ¶ 54.)  Plaintiff claims he was never
"informed by anyone at FSA or [USMS] that his job performance
was either sub-par or not in compliance with the [AFSC]." (Id.
¶ 58.)  "Despite Wolf's contention that it was Morales' decision
to remove Plaintiff from the [AFSC]," Plaintiff claims
"Defendants conspired together to remove Plaintiff from
performing under the [AFSC]." (Id. ¶ 55.)

Plaintiff commenced this action on November 30, 2010,
alleging the following claims: (1) a claim against FSA, USMS,

and Morales for retaliating against him in violation of the FCA;
(2) a common law claim against Morales in his individual
capacity for tortious interference with a business advantage;
(3) a common law claim against Morales in his individual
capacity for wrongful termination; (4) a claim against USMS and
Morales for retaliating against him in violation of the First
Amendment; and (5) a claim against FSA under Virginia law for
violating Virginia's public policy.  On March 15, 2011,
Plaintiff amended his complaint to add a sixth claim against FSA
under the New Jersey Conscientious Employee Protection Act, N.J.
Stat. Ann. § 34:19-1 et seq., and to assert his First Amendment
retaliation claim against Morales only.

On April 11, 2011, USMS and Morales moved, pursuant to
Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), to
dismiss the amended complaint for lack of subject matter
jurisdiction and for failure to state a claim upon which relief
can be granted.  The Court now decides that motion.[2]

---

[2] FSA answered the amended complaint on April 11, 2011, and,
unlike its codefendants, has not moved to dismiss.  Accordingly,
Plaintiff's claims under Virginia and New Jersey law, as well as
his FCA claim against FSA, are not at issue here.

II.   LEGAL STANDARD

          In assessing a motion to dismiss under Rule 12(b)(6),
a court must accept all non-conclusory factual allegations as
true and draw all reasonable inferences in the plaintiff's
favor.  Goldstein, 516 F.3d at 56.  To survive the motion, "a
complaint must contain sufficient factual matter, accepted as
true, to 'state a claim to relief that is plausible on its
face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)
(quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).
A pleading that offers "labels and conclusions" or "a
formalistic recitation of the elements of a cause of action will
not do."  Twombly, 550 U.S. at 555.  "Where a complaint pleads
facts that are 'merely consistent with' a defendant's liability,
it 'stops short of the line between possibility and plausibility
of entitlement to relief.'"  Iqbal, 129 S. Ct. at 1949 (quoting
Twombly, 550 U.S. at 557) (internal quotation marks omitted).

          The standard for a Rule 12(b)(1) motion to dismiss for
lack of subject matter jurisdiction is "substantively identical"
to that governing Rule 12(b)(6), except the plaintiff bears the
burden of establishing jurisdiction in a 12(b)(1) motion, Lerner
v. Fleet Bank, N.A., 318 F.3d 113, 128 (2d Cir. 2003), and must
do so by a preponderance of the evidence, Aurecchione v.
Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005).
"'[J]urisdiction must be shown affirmatively, and that showing

is not made by drawing from the pleadings inferences favorable
to the party asserting it.'" <u>Morrison v. Nat'l Austl. Bank
Ltd.</u>, 547 F.3d 167, 170 (2d Cir. 2008) (quoting <u>APWU v. Potter</u>,
343 F.3d 619, 623 (2d Cir. 2003)).

III. DISCUSSION

      The Moving Defendants seek to dismiss the following
claims: (1) the FCA retaliation claim in Count One against both
USMS and Morales; (2) the common law claims in Counts Two and
Three against Morales in his individual capacity for
interference with Plaintiff's contractual rights; and (3) the
First Amendment retaliation claim in Count Four against Morales
in his individual capacity.

    A.   <u>False Claims Act</u>

      Count One alleges that USMS and Morales—as well as
FSA—retaliated against him in violation of the whistleblower
provision of the FCA.  "[T]o encourage any individual knowing of
Government fraud to bring that information forward," S. Rep. No.
99-345, at 2 (1986), <u>reprinted in</u> 1986 U.S.C.C.A.N. 5266, 5266-
67, the FCA contains a <u>qui tam</u> provision that entitles a private
relator to bring an FCA action "in the name of the Government."
31 U.S.C. § 3730(b)(1).  Furthermore, because the FCA, in part,
"was designed by Congress to protect against retaliation the
class of whistleblowers whose activities benefit the public

fisc," Brown v. City of S. Burlington, 393 F.3d 337, 346 (2d

Cir. 2004), claims of retaliation brought under the FCA allow

for individual relief.  The whistleblower provision of the FCA,

section 3730(h), provides:

> (1) In general.  Any employee, contractor,
> or agent shall be entitled to all relief
> necessary to make that employee, contractor,
> or agent whole, if that employee,
> contractor, or agent is discharged, demoted,
> suspended, threatened, harassed, or in any
> other manner discriminated against in the
> terms and conditions of employment because
> of lawful acts done by the employee,
> contractor, agent or associated others in
> furtherance of an action under this section
> or other efforts to stop 1 or more
> violations of [the FCA].
>
> (2) Relief.  Relief under paragraph (1)
> shall include reinstatement with the same
> seniority status that employee, contractor,
> or agent would have had but for the
> discrimination, 2 times the amount of back
> pay, interest on the back pay, and
> compensation for any special damages
> sustained as a result of the discrimination,
> including litigation costs and reasonable
> attorneys' fees.

31 U.S.C. § 3730(h)(1)-(2).  "This provision protects employees

who assist the government in the investigation and prosecution

of violations of the False Claims Act."  McAllan v. Von Essen,

517 F. Supp. 2d 672, 685 (S.D.N.Y. 2007).  In support of their

motion to dismiss Plaintiff's FCA retaliation claim, the Moving

Defendants argue (1) sovereign immunity bars Plaintiff from

proceeding against USMS under section 3730(h); and (2) section 3730(h) does not apply to individuals such as Morales.

    1.   <u>USMS</u>

     "The Federal Government cannot be sued without its consent." <u>United States v. Navajo Nation</u>, 556 U.S. 287, 289 (2009). Accordingly, "[j]urisdiction over any suit against the Government requires a clear statement from the United States waiving sovereign immunity, together with a claim falling within the terms of the waiver." <u>United States v. White Mountain Apache Tribe</u>, 537 U.S. 465, 472 (2003) (citations omitted). The same is true of suits against agencies of the Federal Government. <u>See</u> <u>FDIC v. Meyer</u>, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit.").

     "The terms of consent to be sued may not be inferred, but must be 'unequivocally expressed'. . . ." <u>White Mountain Apache Tribe</u>, 537 U.S. at 472 (quoting <u>United States v. Mitchell</u>, 445 U.S. 535, 538 (1980)); <u>see also</u> <u>County of Suffolk v. Sebelius</u>, 605 F.3d 135, 140 (2d Cir. 2010) ("Absent an unequivocally expressed statutory waiver, the United States, its agencies, and its employees (when functioning in their official capacities) are immune from suit based on the principle of sovereign immunity." (internal quotation marks omitted)). Indeed, "[t]he sovereign immunity of the United States may only

be waived by federal statute," <u>Presidential Gardens Assocs. v. United States ex rel. Sec'y of Hous. & Urban Dev.</u>, 175 F.3d 132, 139 (2d Cir. 1999), and such a waiver "must be unequivocally expressed in statutory text, and cannot simply be implied." <u>Adeleke v. United States</u>, 355 F.3d 144, 150 (2d Cir. 2004) (internal quotation marks omitted).

Here, Plaintiff points to no text in section 3730(h) or anywhere else in the FCA as evidence that Congress "unequivocally expressed" its intent to abrogate sovereign immunity thereunder.  Plaintiff also fails to cite any caselaw to support his claim.  To the contrary, given the statute's silence regarding suits against the Government, courts have held that Congress did <u>not</u> abrogate the Federal Government's sovereign immunity when it enacted section 3730(h).  <u>See, e.g.</u>, <u>Shaw v. United States</u>, 213 F.3d 545, 548 (10th Cir. 2000); <u>see also</u> <u>Pentagen Techs. Int'l Ltd. v. United States</u>, 172 F. Supp. 2d 464, 471 n.6 (S.D.N.Y. 2001) ("Given the governing statutory scheme, it is likely that any argument maintaining that the Government intended to waive its sovereign immunity in the context of the FCA would be meritless.  Indeed, because the FCA allows individuals to sue on behalf of the Government to recover federal monies, it is illogical that the Government itself could be sued under the same Act.").  Other courts have reached the same conclusion with respect to state sovereign immunity under

the Eleventh Amendment.  See, e.g., United States v. Tex. Tech
Univ., 171 F.3d 279, 294-95 (5th Cir. 1999) (barring retaliation
claim against the State of Texas pursuant to section 3730(h)
based on state sovereign immunity).  The Court finds no reason
to depart from this substantial line of authority.

        Plaintiff argues that these decisions "all precede the
enactment of the recent amendment to § 3730(h)."  (Pl. Opp. at
1-2.)  Indeed, as discussed in greater detail below, whereas the
prior version of section 3730(h) provided a cause of action for
a whistleblower who had experienced retaliation "by his or her
employer," Congress eliminated that phrase when it amended the
FCA in 2009.  Plaintiff implies that this change shows Congress
intended the post-amendment whistleblower provision to permit
suits against the Government; at the very least, Plaintiff
argues this area of the law is "greatly unsettled," which
precludes dismissing his retaliation claim against USMS at this
stage of the litigation.  (Id. at 3.)

        Plaintiff's argument overlooks the fact that nothing
in the amended text of section 3730(h) or any other statutory
text evidences an unequivocal intent to waive sovereign immunity
under the FCA.  Because "the government's consent to be sued is
strictly construed and cannot arise by implication," Diaz v.
United States, 517 F.3d 608, 611 (2d Cir. 2008), Congress's
silence in section 3730(h) cannot be interpreted as a waiver of

14

the Federal Government's immunity from suits under that
provision.  Cf. Bell v. Dean, No. 09 Civ. 1082, 2010 WL 1856086,
at *4 (M.D. Ala. May 4, 2010) ("The requirement of a clear
statutory statement of congressional intent to waive state
sovereign immunity is no more met by silence as to who may be
made a defendant than it is by a word such as 'employer,' which,
read literally, would include states and their agencies.").
Contrary to Plaintiff's erroneous characterization, this
principle of law could not be more settled.[3]  Accordingly,
Plaintiff's FCA claim against USMS is dismissed.[4]

---

[3] Plaintiff cites two cases in which certain state-entities have
been held amenable to suit under section 3730(h).  See United
States ex rel. Satalich v. City of Los Angeles, 160 F. Supp. 2d
1092, 1109-10 (C.D. Cal. 2001); Wilkins v. St. Louis Hous.
Auth., 198 F. Supp. 2d 1080, 1087 (E.D. Mo. 2001).  These cases
stand for the proposition that state sovereign immunity "does
not extend to suits prosecuted against a municipal corporation
or other governmental entity which is not an arm of the State."
Alden v. Maine, 527 U.S. 706, 756 (1999).  Because the present
analysis focuses on federal sovereign immunity, a right which
USMS enjoys absent a waiver, Meyer, 510 U.S. at 475, these cases
are inapposite.

[4] After the parties fully briefed the instant motion, Plaintiff
sent a letter to the Court arguing that his claim against USMS
is not barred by sovereign immunity to the extent it seeks the
equitable remedy of reinstatement.  It is true that the Court of
Appeals has held that a claim by a federal employee for
reinstatement is not barred by sovereign immunity so long as the
equitable relief sought is prospective.  See Dotson v. Griesa,
398 F.3d 156, 177-79 (2d Cir. 2005).  Plaintiff, however, is an
employee of FSA, not USMS, and cites no authority for the
proposition that a federal government agency-even one with the
power to direct a government contractor to terminate one of its
employees-may be the subject of an order to reinstate an
(cont'd on next page)

2.   Morales

"[B]ecause a suit against a federal employee in his
official capacity is a suit against the government," King v.
Simpson, 189 F.3d 284, 287 (2d Cir. 1999), to the extent
Plaintiff brings his FCA claim against Morales in his official
capacity, that claim must be dismissed for the same reasons that
his FCA claim against USMS must be dismissed, see Sebelius, 605
F.3d at 140; supra Part III.A.1.  To the extent Plaintiff brings
his FCA claim against Morales in his individual capacity, that
claim stands on a different footing.  Morales argues the claim
should nevertheless be dismissed because only the employer
itself, and not individual supervisors, may be held liable under
section 3730(h).  That certainly was the case when section
3730(h) referred to retaliation "by [one's] employer."  See,
e.g., United States ex rel. Golden v. Ark. Game & Fish Comm'n,
333 F.3d 867, 870-71 (8th Cir. 2003); United States ex rel.
Sarafoglou v. Weill Med. Coll. of Cornell Univ., 451 F .Supp. 2d
613, 625 (S.D.N.Y. 2006) ("Although plaintiff's retaliation
claim against Cornell Medical is sufficient to withstand

_____

(cont'd from previous page)
employee of that contractor, absent contractual authority to do
so.  In the absence of legal authority supporting the
availability of the equitable relief Plaintiff seeks, his claim
is dismissed.  In any event, because Plaintiff's FCA claim
against FSA allows for the potential relief of reinstatement,
see 31 U.S.C. § 3730(h)(2), the Court's dismissal of the FCA
claim against USMS does not foreclose the equitable relief
Plaintiff seeks.

16

dismissal, her retaliation claims against Dr. New and Dr. Gotto cannot survive because neither of them was her 'employer,' and only employers can incur liability under § 3730(h).").  However, it is less clear that the statute still applies only to employers now that Congress has removed the statute's reference to retaliation "by [an] employer."  See Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4(d), 123 Stat. 1617, 1624-25.  Complicating matters is the fact that the Court is aware of no other court's having conclusively decided this issue.[5]

In resolving the issue, the Court begins from the premise that "[w]hen Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect."  Stone v. INS, 514 U.S. 386, 397 (1995).  Indeed, if it is true that "[w]here Congress includes limiting language in an

---

[5] Apparently the only decision that even discusses the issue is Laborde v. Rivera-Dueño, 719 F. Supp. 2d 198, 203-05 (D.P.R. 2010), in which the district court denied a motion to dismiss a section 3730(h) claim against an individual defendant. Plaintiff characterizes this decision as "persuasive authority," (Pl. Opp. at 4), but the Court is not so persuaded for two reasons.  First, the Laborde court did not advance any affirmative reason to interpret the amended statute as providing for individual liability.  Rather, the court merely held that it would deny the motion to dismiss "[i]n the absence of specific First Circuit guidance holding that individual liability does not exist in FCA retaliation claims, and in light of the fact that the persuasive authority on the issue relies upon an outdated version of the statute."  Laborde, 719 F. Supp. 2d at 205.  Second, the Laborde court later vacated its decision on other grounds.  See 2011 WL 814965 (D.P.R. Mar. 4, 2011).

earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended," Russello v. United States, 464 U.S. 16, 23-24 (1983), it seems logical to presume the same must be true when Congress deletes a word from a previously enacted statute.  That seems particularly sensible given that "Congress is presumed . . . to be aware of prior judicial interpretations of similar statutory provisions." Strom v. Goldman, Sachs & Co., 202 F.3d 138, 147 (2d Cir. 1999), abrogated on other grounds by Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204 (2002).  Accordingly, there is some merit to Plaintiff's contention that "Defendants are asking this Court to read words into a statute that are simply no longer there."  (Pl. Opp. at 4.)

However, the Court is not convinced that when Congress "deleted the word 'employer[]' from the statute," Congress was "expressing its intent to dramatically widen the scope of potential defendants in retaliation claims filed under the FCA." (Id. at 5.)  When considering amendments to legislation, courts "must read the Act as a whole . . . [and cannot] ignore the common sense, precedent, and legislative history of the setting that gave it birth."  FTC v. Jantzen, Inc., 386 U.S. 228, 234-35 (1967) (internal quotation marks omitted).  Here, those interpretive aids rebut the presumption that Congress intended

to expand liability by removing the word "employer" from section 3730(h).

First, the primary purpose of the 2009 amendment to the FCA's anti-retaliation provision was to expand what formerly was a cause of action only for an "employee" into a cause of action for an "employee, contractor, or agent."  According to the House Report, Congress intended for the amendment to "broaden protections for whistleblowers by expanding the False Claims Act's anti-retaliation provision to cover any retaliation against those who planned to file an action (but did not), people related to or associated with relators, and contract workers and others who are not technically 'employees.'"  H.R. Rep. No. 111-97, at 14 (2009).  The Report contains no similar statement of intent to expand the scope of liability to include individuals.[6]  Where Congress <u>expressly</u> stated its intent to expand the definition of a whistleblower and added <u>specific</u> language to effectuate that intent, it strains common sense to read Congress's <u>silence</u> in the same sentence of the statute as

---

[6] Indeed, when discussing caselaw that prompted the need to amend the FCA's anti-retaliation provision, the Report only cites cases that wrestled with the question of who qualified as an "employee" under section 3730(h)'s prior incarnation.  <u>See</u> H.R. Rep. No. 111-97, at 7 ("Since the 1986 amendments, courts have also limited the scope of the False Claims Act's anti-retaliation provisions.  For instance, several courts have read new limits into the Act by holding that the protections of the Act's anti-retaliation provisions apply only to 'employees,' and not to independent contractors, subcontractors, or agents.").

effectuating an <u>unexpressed</u> intent to expand the class of defendants subject to liability under the statute.

That is particularly true in light of the aforementioned presumption that Congress was aware that courts had uniformly rejected individual liability under section 3730(h).  Thus, if Plaintiff is correct, Congress overturned this line of authority by negative implication.  That seems unlikely given that Congress could have simply replaced "employer" with "any person."  Indeed, Congress has used that phrase in several anti-retaliation statutes.  <u>See, e.g.</u>, 29 U.S.C. § 215(a)(3) (providing that "it shall be unlawful for any person" to retaliate against employees who engage in activity protected by the Fair Labor Standards Act); 29 U.S.C. § 2615(b) (providing that "[i]t shall be unlawful for any person to discharge or in any other manner discriminate against any individual because such individual" has taken certain actions protected by the Family and Medical Leave Act).[7]  That Congress chose not to use that phrase—or a similar one—in section 3730(h) makes it more likely that Congress deleted the word "employer"

---

[7] <u>But cf.</u> <u>Spiegel v. Schulmann</u>, 604 F.3d 72, 79-80 (2d Cir. 2010) (holding that the anti-retaliation provisions of the Americans with Disabilities Act ("ADA"), which literally prohibit retaliation by any "person," do not provide for individual liability because the ADA expressly incorporates the remedial provisions of Title VII, which do not provide for individual liability).

not to provide for individual liability but to avoid confusion

in cases involving a "contractor or agent" rather than an

"employee."

It is also notable that the 2009 amendment did not

change the remedies available under section 3730(h), which, as

Morales points out, are mandatory:

> Relief under [this section] shall include
> reinstatement with the same seniority status
> that employee, contractor, or agent would
> have had but for the discrimination, 2 times
> the amount of back pay, interest on the back
> pay, and compensation for any special
> damages sustained as a result of the
> discrimination, including litigation costs
> and reasonable attorneys' fees.

31 U.S.C. § 3730(h)(2) (emphasis added).  Courts generally have

interpreted this type of mandatory language as depriving them of

discretion regarding remedies.  See, e.g., Eberhardt v.

Integrated Design & Constr., Inc., 167 F.3d 861, 872 (4th Cir.

1999) ("Section 3730(h) . . . does not provide for a

discretionary award of prejudgment interest.  Rather, use of the

word 'shall' mandates such an award.").  The Court of Appeals

cited this mandatory language in rejecting individual liability

under the pre-amendment version of section 3730(h) on the common

sense ground that "remedies such as reinstatement" are remedies

"[that] a mere supervisor could not possibly grant in his

individual capacity."  Yesudian ex rel. United States v. Howard

Univ., 270 F.3d 969, 972 (D.C. Cir. 2001).  The same logic

remains sound even after the 2009 amendment; interpreting amended section 3730(h) to provide for individual liability is inconsistent with the mandatory remedy of reinstatement.

The foregoing considerations taken together, _i.e._, that 1) Congress's expressed purpose in amending section 3730(h) was to expand the class of potential _plaintiffs_, 2) Congress was silent on the issue of the class of potential _defendants_, that is, on the issue of individual liability, and failed to substitute "person" for "employer," and 3) Plaintiff's interpretation leads to an unavoidable contradiction within the statute, leads the Court to conclude that Congress deleted the relevant language not to provide for individual liability but as a grammatical necessity of expanding the statute's protections to cover a "contractor" or "agent" in addition to an "employee." Accordingly, the Court concludes that amended section 3730(h) does not provide a cause of action against individual defendants such as Morales. Plaintiff's FCA claim against Morales is therefore dismissed.

B.   State Common Law Claims for Tortious Interference

Morales characterizes Plaintiff's common law claims in Counts Two and Three essentially as claims for tortious interference with Plaintiff's contractual rights. Plaintiff does not dispute this characterization. Instead, Plaintiff argues Morales committed the alleged tortious acts while acting

outside the scope of his employment, which would allow these claims to go forward against Morales in his individual capacity (rather than against the United States as a substituted defendant were Morales acting within the scope of his employment).

As stated previously, "[a]bsent an unequivocally expressed statutory waiver, the United States, its agencies, and its employees (when functioning in their official capacities) are immune from suit based on the principle of sovereign immunity." Sebelius, 605 F.3d at 140 (internal quotation marks omitted). While the FCA did not abrogate the Federal Government's immunity, the Federal Tort Claims Act ("FTCA") did so with respect to any "injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 2679(b)(1). The FTCA provides a "remedy against the United States" that is "exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim." Id. Essentially, the FTCA "accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties," Osborn v. Haley, 549 U.S. 225, 229 (2007), while

23

simultaneously abrogating the Federal Government's <u>respondeat</u>
<u>superior</u> liability for some of those acts.  Thus, "'[s]cope of
employment' sets the line.  If [Morales] is inside that line, he
is not subject to [Plaintiff's] suit; if he is outside the line,
he is personally answerable."  <u>Gutierrez de Martinez v. Lamagno</u>,
515 U.S. 417, 423 (1995) (citations omitted).

       1.   <u>Scope of Employment</u>

     The United States Attorney for the Southern District
of New York, acting pursuant to authority delegated to him by
the Attorney General, <u>see</u> 28 C.F.R. § 15.4(a), certified that
Morales was acting within the scope of his employment when he
committed the alleged tortious acts described in the amended
complaint.  (<u>See</u> Bober Decl. Ex. A.)  Under the FTCA,

> [u]pon certification . . . that the
> defendant employee was acting within the
> scope of his office or employment at the
> time of the incident out of which the claim
> arose, any civil action or proceeding
> commenced upon such claim . . . shall be
> deemed an action against the United States
> . . . and the United States shall be
> substituted as the party defendant.

28 U.S.C. § 2679(d)(1).  However, "certification is 'the first,
but not the final word' on whether the federal officer is immune
from suit and, correlatively, whether the United States is
properly substituted as defendant."  <u>Osborn</u>, 549 U.S. at 246
(quoting <u>Lamagno</u>, 515 U.S. at 432).  A plaintiff may request
judicial review of the scope-of-employment determination, <u>id.</u>,

which the court undertakes de novo "if [the] plaintiff[]
allege[s] with particularity facts relevant to the scope-of-
employment issue." Bello v. United States, 93 F. App'x 288, 289
(2d Cir. 2004) (summary order) (internal quotation marks
omitted).  When conducting its review of the Government's scope-
of-employment determination, "the district court applies state
law principles pertaining to when intentional torts conduct
falls within the scope of a party's employment." Id.; see also
Maldonado v. Colon, No. 97 Civ. 3966, 1998 WL 240479, at *3
(S.D.N.Y. May 12, 1998) ("To determinate whether a federal
employee was or was not acting within the scope of his
employment, the Court looks to the state law in which the
allegedly wrongful conduct took place.").

On this issue, the parties agree that New York law
applies.[8]  Under New York law, "[a]n act is considered to be

---

[8] It is not entirely obvious that the alleged tortious
interference with Plaintiff's contract occurred in New York
given that Morales worked in Washington, D.C., and FSA has its
principle place of business in Virginia.  (See Am. Compl. ¶¶ 5,
41.)  However, the Court need not engage in that academic
inquiry because the parties agree that New York law applies, and
there is little indication that a different result would follow
from applying the law of the District of Columbia or that of
Virginia.  Compare, e.g., Fenster v. Ellis, 898 N.Y.S.2d 582,
584 (App. Div. 2d Dep't 2010) ("An act is considered to be
within the scope of employment if it is performed while the
employee is engaged generally in the business of his employer,
or if his act may be reasonably said to be necessary or
incidental to such employment." (citations omitted)), with
Johnson v. Weinberg, 434 A.2d 404, 408 (D.C. 1981) ("It is true
(cont'd on next page)

within the scope of employment if it is performed while the

employee is engaged generally in the business of his employer,

or if his act may be reasonably said to be necessary or

incidental to such employment." Fenster v. Ellis, 898 N.Y.S.2d

582, 584 (App. Div. 2d Dep't 2010) (citations omitted); see also

Bello, 93 F. App'x at 291 ("New York law holds that a defendant

does not act within the scope of his employment when he engages

in tortious conduct for personal reasons separate and distinct

from the interests of his employer, particularly when the

conduct involves acts not commonly done by those in his

position." (citations omitted)); McMindes v. Jones, 839 N.Y.S.2d

365, 366 (App. Div. 4th Dep't 2007) ("In determining the scope

of the employment, 'the test has come to be whether the act was

done while the servant was doing his master's work, no matter

how irregularly, or with what disregard of instructions.'"

---

(cont'd from previous page)
that an employer will not be deemed liable for the intentional
torts of an employee which are committed solely in furtherance
of the latter's own interests, and not those of the employer.
However, in viewing this narrower question an employee's
intentional tort it is equally clear that where a tort is the
outgrowth of a job-related controversy, then the employer
remains liable, since the master and servant relationship is not
broken.  The critical question to be resolved is whether the
conduct in question was foreseeable as being within the range of
responsibilities entrusted to the employee." (internal quotation
marks and citations omitted)), and Giant of Md., Inc. v. Enger,
515 S.E.2d 111, 113 (Va. 1999) ("[A]n employer is responsible
for an employee's tortious act if that act was within the scope
of the duties of the employment and in the execution of the
service for which the employee was engaged.").

(quoting <u>Riviello v. Waldron</u>, 391 N.E.2d 1278, 1281 (N.Y. 1979))).

"There is no single mechanical test to determine whether at a particular moment an employee is engaged in the employer's business . . . ." <u>Rausman v. Baugh</u>, 682 N.Y.S.2d 42, 43 (App. Div. 2d Dep't 1998). Rather, courts must weigh the following factors:

> the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated.

<u>Riviello</u>, 391 N.E.2d at 1281.

Applying New York's substantive law on scope-of-employment determinations and viewing the alleged tortious conduct in the light most favorable to Plaintiff, <u>see</u> <u>Bello</u>, 93 F. App'x at 289-90, Plaintiff fails to convince the Court that the Government erred in certifying that Morales acted within the scope of his employment when he committed the alleged tortious acts described in the amended complaint. First, Plaintiff's amended complaint makes the conclusory allegation that "Morales' actions against Plaintiff were taken outside the scope of his employment as Acting Assistant Director of the AFP." (Am. Compl. ¶¶ 70, 76.) But "[t]he simple fact that plaintiff has

27

alleged that defendant[] ha[s] engaged in <u>intentional</u> torts does
not compel the conclusion that the employee was acting outside
the scope of employment under New York law." <u>Dowdy v. Hercules</u>,
No. 07 Civ. 2488, 2010 WL 169624, at *5 n.3 (E.D.N.Y. Jan. 15,
2010) (internal quotation marks omitted); <u>see also</u> <u>Marley v.
Ibelli</u>, 52 F. App'x 564, 566 (2d Cir. 2002) (summary order)
("[T]he only evidence that [plaintiff] proffers is his
subjective belief that the conduct was intentional and motivated
by unlawful bias.  This is simply not enough [to overturn the
scope-of-employment certification]."); <u>Cornell v. Assicurazioni
Generali S.p.A.</u>, No. 97 Civ. 2262, 2000 WL 1099844, at *1
(S.D.N.Y. Aug. 7, 2000) ("[L]egal conclusions couched as factual
allegations are not facts and cannot substitute for facts.").
Because "conclusory statements hardly suffice to refute in
particularity the scope of employment certification," <u>Lettis v.
U.S. Postal Serv.</u>, 39 F. Supp. 2d 181, 209 (E.D.N.Y. 1998), this
allegation is insufficient to rebut the Government's scope of
employment certification.

        Second, Plaintiff's specific allegations undercut his
argument that Morales acted outside the scope of his employment.
Counts Two and Three center on allegations that, in retaliation
for Plaintiff's blowing the whistle on corruption in the AFP,
Morales initiated an investigation into Plaintiff's performance
and instructed FSA to terminate Plaintiff's employment.  These

allegations directly implicate Morales's managerial
responsibilities.  Plaintiff himself alleges that he told his
supervisors that "Morales, as the Acting Assistant Director of
the AFP, should be informed about his findings." (Am. Compl.
¶ 21.)  That suggests Plaintiff himself believed it was part of
Morales's job to investigate employee misconduct.  Furthermore,
Plaintiff alleges that "the Government purportedly has the
contractual right to require FSA to remove any of its employees
from performance under the contract," (id. ¶ 56), and Plaintiff
does not allege that Morales lacked authority to exercise that
power on behalf of USMS or that any such exercise of power
"involves acts not commonly done by those in [Morales's]
position," Bello, 93 F. App'x at 291.  Thus, taking Plaintiff's
allegations as true, Morales took actions he had the general
power to take as the Acting Assistant Director of the AFP.  That
weighs strongly against finding that those actions were beyond
the scope of Morales's employment, particularly when Morales
threatened to carry them out at a meeting in his office in
Washington, D.C., which he had ordered Plaintiff to attend.

        Of course, the gravamen of Plaintiff's amended
complaint is that Morales exercised his power for the improper
purpose of retaliating against Plaintiff.  And it is true that
"the employer bears no vicarious liability where the employee
committed the tort for personal motives unrelated to the

furtherance of the employer's business."  <u>Yildiz v. PJ Food</u>
<u>Serv., Inc.</u>, 918 N.Y.S.2d 572, 574 (App. Div. 2d Dep't 2011).
But under New York law, "[a]n employer is vicariously liable for
its employees' torts, even where the offending employee's
conduct was intentional, if the acts were committed while the
employee was acting within the scope of his or her employment."
<u>Id.</u>   And the fact that, according to Plaintiff, "Morales
angrily told Plaintiff that Briskman was part of the 'family'
and that Plaintiff should have never looked into his
activities," (Am. Compl. ¶ 43), is consistent with a finding
that Morales acted within the scope of his employment.  The
statement suggests Morales believed that USMS and FSA protect
their own; it follows that Morales's investigation into
Plaintiff's performance and Morales's subsequent ordering that
Plaintiff's employment with FSA be terminated were both carried
out with the interests of Morales's employer in mind rather than
for "personal reasons separate and distinct from the interests
of his employer."  <u>Bello</u>, 93 F. App'x at 291.

        Ultimately, Plaintiff's allegation that Morales used
his managerial authority to interfere with Plaintiff's
contractual relationship with FSA is decisive of the scope of
employment question.  Because Plaintiff has not provided the
Court with particular facts that suggest Morales was acting
outside the scope of his employment—indeed, Plaintiff has

pleaded facts that suggest just the opposite—the Court finds that the United States Attorney properly certified that Morales was acting within the scope of his employment when he committed the acts alleged in Counts Two and Three of the amended complaint.  Accordingly, Morales's employer—the United States—must be substituted for Morales as a defendant with respect to these Counts.

      2.   <u>Effect of Substituting the United States for Morales</u>

      Substituting the United States for Morales does not conclude the matter.  "Upon certification, any action or proceeding . . . shall proceed in the same manner as any action against the United States filed pursuant to [the FTCA] and shall be subject to the limitations and exceptions applicable to those actions."  28 U.S.C. § 2679(d)(4).  Morales argues that two such limitations require dismissal of Counts Two and Three.

      First, Morales argues that Plaintiff has not exhausted his administrative remedies.  Indeed, the FTCA provides that no district court shall have jurisdiction over an action premised on a claim under the FTCA unless the plaintiff has "first presented the claim to the appropriate Federal agency" and the claim has "been finally denied."  <u>Id.</u> § 2675(a).  "Unless a plaintiff complies with [the FTCA's strictly construed prerequisites], a district court lacks subject matter

jurisdiction over a plaintiff's FTCA claim." Johnson v.
Smithsonian Inst., 189 F.3d 180, 189 (2d Cir. 1999).  Yet
Plaintiff does not allege that he filed any requisite
administrative action, and USMS avers that it does not possess
records of any such filing.  (See Auerbach Decl.)  Accordingly,
the Court lacks subject matter jurisdiction over Plaintiff's
claims as construed against the United States.

        Second, Morales argues that the FTCA does not waive
the Federal Government's immunity with respect to claims for
tortious interference.  Indeed, the FTCA does "not apply to" a
"claim arising out of . . . interference with contrac rights."
28 U.S.C. § 2680(h).  Thus, "actions for tortious interference
with [a] business (i.e., prospective) advantage 'are barred as
claims arising out of interference with contract rights.'"  Chen
v. United States, 854 F.2d 622, 628 n.2 (2d Cir. 1988) (quoting
Art Metal-U.S.A., Inc. v. United States, 753 F.2d 1151, 1155
(D.C. Cir. 1985)).  Accordingly, "Plaintiff['s] claims that the
Government tortiously interfered with [his] contracts and
tortiously interfered with [his] prospective employment must be
dismissed because the United States has not waived sovereign
immunity for such claims."  Erbacci, Cerone, & Moriarty, Ltd. v.
United States, 939 F. Supp. 1045, 1059 (S.D.N.Y. 1996); see also
Lipkin v. SEC, 468 F. Supp. 2d 614, 616 (S.D.N.Y. 2006) (holding
that the plaintiffs' interference with contract claim against

the SEC "fall[s] outside the limited waiver of sovereign
immunity provided by the FTCA").

        In sum, with respect to Counts Two and Three, the
United States must be substituted for Morales because he was
acting within the scope of his employment when committing the
alleged acts described therein.  However, considered as claims
against the United States, Counts Two and Three fail as a matter
of law.  Accordingly, the Court dismisses those claims.

        C.   First Amendment Claim

        The final claim at issue is Plaintiff's claim in Count
Four that Morales retaliated against him for engaging in speech
protected by the First Amendment.  "The federal courts'
statutory jurisdiction to decide federal questions confers
adequate power to award damages to the victim of a
constitutional violation."  Bush v. Lucas, 462 U.S. 367, 378
(1983).  The Supreme Court first exercised that power in Bivens
v. Six Unknown Federal Narcotics Agents, 403 U.S. 388 (1971),
when the Court "recognized as implicit in the rights guaranteed
by the Fourth Amendment a cause of action for money damages
against federal officials, sued in their individual capacities,
who had allegedly violated those rights."  Dotson v. Griesa, 398
F.3d 156, 165-66 (2d Cir. 2005) (citing Bivens, 403 U.S. at 396-
97).  "Bivens actions have subsequently been recognized to
vindicate rights protected by the Eighth Amendment and the Due

33

Process Clause." <u>Dotson</u>, 398 F.3d at 166 (citations omitted).

       1.   <u>Standard for Recognizing a Bivens Action</u>

     "The purpose of <u>Bivens</u> is to deter individual federal officers from committing constitutional violations." <u>Corr. Servs. Corp. v. Malesko</u>, 534 U.S. 61, 70 (2001). "Because a <u>Bivens</u> action is a judicially created remedy, however, courts proceed cautiously in extending such implied relief . . . ." <u>Dotson</u>, 398 F.3d at 166. Thus, prior cases "establish [the federal courts'] power to grant relief that is not expressly authorized by statute, but they also [emphasize] that such power is to be exercised in light of relevant policy determinations made by the Congress." <u>Bush</u>, 462 U.S. at 373. Indeed,

> any freestanding damages remedy for a
> claimed constitutional violation has to
> represent a judgment about the best way to
> implement a constitutional guarantee; it is
> not an automatic entitlement no matter what
> other means there may be to vindicate a
> protected interest, and in most instances
> [the Supreme Court has] found a <u>Bivens</u>
> remedy unjustified.

<u>Wilkie v. Robbins</u>, 551 U.S. 537, 550 (2007).

     Whether a court should recognize a <u>Bivens</u> remedy for a particular constitutional violation typically involves a two-step inquiry. <u>See</u> <u>id.</u> First, "there is the question whether any alternative, existing process for protecting the [constitutionally recognized] interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new

34

and freestanding remedy in damages."  Id.  "When Congress
provides an alternative remedy, it may, of course, indicate its
intent, by statutory language, by clear legislative history, or
perhaps even by the statutory remedy itself, that the [federal
courts'] power should not be exercised."  Bush, 462 U.S. at 378;
see also Schweiker v. Chilicky, 487 U.S. 412, 423 (1988) ("When
the design of a Government program suggests that Congress has
provided what it considers adequate remedial mechanisms for
constitutional violations that may occur in the course of its
administration, [the Supreme Court has] not created additional
Bivens remedies.").

        In the absence of an alternative, congressional
remedy, step two requires the court to exercise its judgment
whether a Bivens remedy would be appropriate.  See Wilkie, 551
U.S. at 550.  In this regard, the court must "make the kind of
remedial determination that is appropriate for a common-law
tribunal, paying particular heed, however, to any special
factors counselling hesitation before authorizing a new kind of
federal litigation."  Bush, 462 U.S. at 378.  "[T]he concept of
'special factors counselling hesitation in the absence of
affirmative action by Congress' has proved to include an
appropriate judicial deference to indications that congressional
inaction has not been inadvertent."  Schweiker, 487 U.S. at 423
(quoting Bivens, 403 U.S. at 396).

A corollary to such deference is that "[t]he absence of statutory relief for a constitutional violation . . . does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation." Id. at 421-22. "It [does] not matter . . . that 'the creation of a Bivens remedy would obviously offer the prospect of relief for injuries that must now go unredressed.'" Malesko, 534 U.S. at 69 (quoting Schweiker, 487 U.S. at 425). Rather, "it is the overall comprehensiveness of the statutory scheme at issue, not the adequacy of the particular remedies afforded, that counsels judicial caution in implying Bivens actions." Dotson, 398 F.3d at 166-67.

   2.   No Alternative Remedial Scheme Exists to Redress
        Plaintiff's Injury

        Plaintiff argues that he passes the first step of the Bivens inquiry because Congress has not provided an alternative remedial scheme to redress the alleged violation of his First Amendment free speech rights. Morales does not appear to argue otherwise, and the Court similarly is unaware of any remedial program available to redress Plaintiff's alleged constitutional injury. "This, then, is a case for Bivens step two, for weighing reasons for and against the creation of a new cause of action, the way common law judges have always done." Wilkie, 551 U.S. at 554.

### 3.   Special Factors Preclude Plaintiff's Bivens Claim

Proceeding to step two of the analysis, the Court concludes, on the facts of this case, that special factors counsel against recognizing a <u>Bivens</u> action on Plaintiff's behalf.  First, as noted above, the existence of a comprehensive statutory scheme to redress specific injuries may act as a special factor against recognizing a <u>Bivens</u> action.  <u>See, e.g.</u>, <u>Dotson</u>, 398 F.3d at 166 ("The enactment and amendment of the [Civil Service Reform Act ("CSRA")] to construct an elaborate remedial scheme for dealing with federal employment issues has been identified by the Supreme Court as a special factor cautioning against recognition of an implied right of action for federal employment disputes." (citing <u>Bush</u>, 462 U.S. at 388) (internal quotation marks omitted)).  The parties believe that whether to recognize a <u>Bivens</u> remedy in the context of this case turns in large part on the scope of the Contract Disputes Act ("CDA").  The CDA requires all claims by a contractor against the Federal Government "relating to a contract" to be in writing and "submitted to the contracting officer for a decision."  41 U.S.C. § 7103(a)(1)-(2).  Two avenues exist for review of a contracting officer's decision: "a contractor may appeal the contracting officer's decision to the pertinent agency's board of contract appeals within 90 days after it receives the decision or the contractor may file a claim in the United States

Court of Federal Claims."  Evers v. Astrue, 536 F.3d 651, 657
(7th Cir. 2008) (citations omitted).  The CDA defines a
"contractor" as "a party to a Federal Government contract other
than the Federal Government."  41 U.S.C. § 7101(7).

        Plaintiff notes that the CDA provides a cause of
action to a government contractor only, not to an employee of
that contractor.  Because Plaintiff was not a party to the AFSC,
a contract between FSA and the Federal Government, Plaintiff
says he is precluded from filing suit under the CDA.  Morales
does not appear to contest this point and for good reason:
"employees of corporations contracting with the [G]overnment
have no contractual relationship with the Government and
therefore cannot maintain a suit against the United States."
Christos v. United States, 48 Fed. Cl. 469, 476-77 (2000)
(internal quotation marks and citation omitted).[9]  However, as
Morales points out, "the issue is not whether a remedial scheme
is available to [Plaintiff]; it is whether such a scheme exists.
That [Plaintiff] may not be able to avail himself of it is of no
consequence."  (Defs. Reply at 7.)  And similarly
inconsequential is the fact that Plaintiff may be entitled to
some, but not complete, relief.  Indeed, several decisions of

---

[9] It is also unlikely that the AFSC "reflects the express or
implied intention of the parties to benefit [a] third-party,"
i.e., Morales.  Christos, 48 Fed. Cl. at 477.  But the Court is
in no position to conclude either way because the AFSC is not
before the Court.

the Supreme Court and the Court of Appeals stand for these very
propositions.

The first is Bush v. Lucas, 462 U.S. 367 (1983).  In
that case, a NASA employee alleged that he was terminated in
retaliation for publicly criticizing the agency—speech which the
Supreme Court assumed was protected by the First Amendment.  See
id. at 369-72.  "Because such claims arise out of an employment
relationship that is governed by comprehensive procedural and
substantive provisions giving meaningful remedies against the
United States," the Supreme Court held "it would be
inappropriate . . . to supplement that regulatory scheme with a
new judicial remedy."  Id. at 368.  Specifically, the Supreme
Court noted that "[f]ederal civil servants are now protected by
an elaborate, comprehensive scheme that encompasses substantive
provisions forbidding arbitrary action by supervisors;" that
"[c]onstitutional challenges to agency action, such as the First
Amendment claims" before the Bush Court, are "fully cognizable
within this system;" and that the system provides "meaningful
remedies for employees who may have been unfairly disciplined
for making critical comments about their agencies."  Id. at 385-
86.  Accordingly, even though "existing remedies do not provide
complete relief," the Supreme Court declined to recognize a
Bivens action for federal employees terminated for speech
protected by the First Amendment.  Id. at 388-89.

"Because the CSRA did afford the employee in <u>Bush v.</u>
<u>Lucas</u> other relief for his injuries, some courts initially
concluded that [deciding not to recognize a <u>Bivens</u> claim]
depended on the statute providing the particular employee with
meaningful remedies for his employment claim." <u>Dotson</u>, 398 F.3d
at 166.  But the Supreme Court soon foreclosed that initial
reading of <u>Bush</u>.  In <u>Schweiker v. Chilicky</u>, 487 U.S. 412 (1988),
the plaintiffs alleged that various Social Security
Administration officials had deprived them of disability
benefits without due process.  <u>See</u> <u>id.</u> at 414.  The Court
acknowledged that the statute governing Social Security "makes
no provision for remedies in money damages against officials
responsible for unconstitutional conduct that leads to the
wrongful denial of benefits."  <u>Id.</u> at 424.  Nevertheless, the
Court noted that "Congress . . . has not failed to provide
meaningful safeguards or remedies for the rights of persons"
denied benefits and that "Congressional attention to problems
that have arisen in the administration" of Social Security was
"frequent and intense."  <u>Id.</u> at 425.  The plaintiffs' plea "that
they simply have not been <u>adequately</u> recompensed for their
injuries" was insufficient to justify recognizing a <u>Bivens</u>
action.  <u>Id.</u> at 428-29 (emphasis added).

    In <u>Dotson v. Griesa</u>, 398 F.3d 156 (2d Cir. 2005), the
Court of Appeals applied the principles of <u>Bush</u> and <u>Schweiker</u> to

a suit by a federal probation officer who alleged that he was terminated without due process based on his race.  The Court of Appeals first noted that, "while the CSRA meticulously categorizes the thousands of federal civil service employees into three categories and provides a detailed and comprehensive means for addressing their employment grievances, it provides no administrative or judicial review rights for non-preference eligible excepted service personnel serving in the judicial branch such as" the plaintiff.  Id. at 165.  Yet, citing Schweiker, the Court of Appeals recognized that "it is the overall comprehensiveness of the statutory scheme at issue, not the adequacy of the particular remedies afforded, that counsels judicial caution in implying Bivens actions."  Id. at 166-67. Accordingly, the Court of Appeals looked for indications that congressional inaction had not been inadvertent in failing to provide judicial employees, including the plaintiff, with a remedy under the CSRA for the claimed violation of his constitutional rights.  See id. at 167.

The Dotson court found three such indications.  First, the Court of Appeals noted that the benefits provisions of the CSRA apply to judicial employees.  The fact that Congress applied some parts of the statute but not others to judicial employees suggests that Congress acted intentionally in denying them review rights under the CSRA.  Id. at 169-70.  Second,

41

Congress had twice amended the "CSRA review provisions
pertaining to excepted service employees" but "did not extend
these procedural protections to judicial branch personnel." Id.
at 170-71.  Third, the Dotson court noted that "Congress has
engaged in an extensive dialogue with the federal courts about
the need to legislate remedies for judicial employment disputes,
with Congress ultimately choosing not to enact any such
legislation" in light of the courts' establishing their own
"detailed and multi-layered levels of administrative review."
See id. at 171-76.  Accordingly, the Court of Appeals concluded
that "judicial branch employees such as [the plaintiff], no less
than other federal employees covered by the CSRA, are precluded
from pursuing Bivens damages actions for adverse employment
decisions." Id. at 176.

       As Morales correctly notes, these decisions establish
that "the lack of an alternative remedy is not dispositive."
(Defs. Reply at 8.)  That a particular plaintiff might suffer
"unredressed" injuries were a court not to recognize a new type
of Bivens action may be a hard truth but it is a truth
nonetheless and one to which the Supreme Court has alerted
potential litigants.  See Malesko, 534 U.S. at 69.  As long as
there are "indications that congressional inaction has not been
inadvertent," Schweiker, 487 U.S. at 423, courts should refrain

from creating a new cause of action.  Such indications exist in this case.

First, the Court notes the weighty caselaw that holds because the CDA represents "'the paradigm of a precisely drawn, detailed statute that . . . purports to provide final and exclusive resolution of all disputes arising from government contracts covered by the statute,'" Evers, 536 F.3d at 657 (quoting Campanella v. Commerce Exch. Bank, 137 F.3d 885, 891 (6th Cir. 1998) (internal quotation marks omitted)), the CDA precludes a government contractor from bringing a Bivens action for claimed violations of the contractor's constitutional rights.  See, e.g., id. at 661 ("Congress has provided government contractors with adequate relief for breaches of governmental contracts under the [CDA].  As such, a government contractor need not resort to constitutional tort suits against federal officers to vindicate his rights when he feels his contract has been unfairly terminated."); Janicki Logging Co. v. Mateer, 42 F.3d 561, 564-65 (9th Cir. 1994); Kesler Enters. v. U.S. Dep't of Agric., No. 10 Civ. 169, 2010 WL 4641360, at *5 (D. Idaho Nov. 4, 2010) ("If [the plaintiff's] work [as a federal contractor] was suspended for any improper reason, including retaliation, the CDA is sufficient to provide relief.").  In other words, were Plaintiff contracting with the Government directly rather than working as an employee of a

government contractor, the Court would easily find Plaintiff's Fourth Amendment claim barred because of the CDA.  And as noted earlier, were Plaintiff a federal employee, his Bivens claim would be precluded because of the CSRA.  See generally Bush v. Lucas, 462 U.S. 367 (1983).

The question, then, is whether the small subset of potential litigants that includes Plaintiff, i.e., employees of federal contractors, should be afforded special solicitude to invoke Bivens when their employers (i.e., the contractors themselves) and federal employees would be foreclosed from doing so.  Given that Congress has long been aware that employees of federal contractors are barred from suing under the CDA and yet has failed to extend the CDA's protections to cover individuals such as Plaintiff suggests that Congress has not acted inadvertently.  And although at least one district court has ruled the CDA does not bar a Bivens action brought by a federal contractor, see Navab-Safavi v. Broad. Bd. of Governors, 650 F. Supp. 2d 40 (D.D.C. 2009), aff'd, 637 F.3d 311 (D.C. Cir. 2011), the Court finds the reasoning for that conclusion flawed.

The plaintiff in Navab-Safavi worked as a translator pursuant to a contract with the Broadcasting Board of Governors, a federal agency.  Id. at 46-47.  She alleged she was terminated from her contract in violation of, inter alia, her First Amendment free speech rights because she produced and appeared

44

in a music video critical of U.S. military operations in Iraq.

See id. at 47-49.  The court held that even though the plaintiff

was a federal contractor, the CDA did not bar the plaintiff from

asserting a Bivens action for the claimed violation of her

constitutional rights because the plaintiff's allegations did

not sound in contract.  See id. at 67-69.  But the argument

advanced by the Navab-Safavi court ignores the following key

considerations:

> [W]hen Congress indicated that "all claims by
> a contractor against the government relating
> to a contract" were to be resolved according
> to the CDA, it meant precisely that—"all
> claims."  Any other view has the potential
> for abuse.  It would be a simple exercise for
> contractors to convert a contract claim into
> a constitutional one by simply characterizing
> as unconstitutional the contracting officers
> [sic] motivation for the termination or
> supension [sic] of a contract.  For example,
> if a contract is suspended due to a
> contractor's alleged failure to meet a
> deadline, a challenge to this decision is
> clearly governed by the CDA; alleging that
> the suspension or breach is based on an
> unconstitutional mens rea does not wrest
> jurisdiction to resolve a dispute from the
> Court of Federal Claims under the CDA and
> bestow it upon the District Court under
> Bivens.

Kesler Enters., 2010 WL 4641360, at *5; accord M.E.S., Inc. v.

Snell, No. 10 Civ. 9153, 2012 WL 1003570, at *5-8 & n.2

(S.D.N.Y. Mar. 26, 2012).  The Court sides with the majority of

other courts that have found the CDA to be a comprehensive

statutory scheme that precludes a federal contractor from
maintaining a <u>Bivens</u> action.[10]

All this is to say that "courts have uniformly refused
to recognize that [<u>Bivens</u>] claims lie in the context of federal
employment." <u>Pollock v. Ridge</u>, 310 F. Supp. 2d 519, 529
(W.D.N.Y. 2004).  Because of this trend in the law the <u>Pollock</u>
court refused to recognize a <u>Bivens</u> action on behalf of a
litigant on all fours with Plaintiff.  There, the plaintiff was
an employee of a federal contractor that provided administrative
services at a detention center pursuant to a contract with the
Immigration and Naturalization Service.  <u>Id.</u> at 522.  The
plaintiff alleged that various employees of the contractor and
the Federal Government discriminated against her based on her
gender and terminated her without due process in violation of
the Fifth Amendment.  <u>See id.</u> at 522, 528.  The court reasoned
that recognizing a <u>Bivens</u> claim in the plaintiff's favor "would

---

[10] The Court also agrees with Morales that <u>Navab-Safavi</u> is
distinguishable on the ground that it involved "speech the
contractor [made] in the capacity of a private citizen, wholly
unrelated to responsibilities as a contractor" whereas here
Plaintiff alleges "wrongful termination due to his conduct
during working hours and interactions with co-workers."  (Defs.
Mem. at 23 n.7); <u>accord</u> <u>M.E.S., Inc.</u>, 2012 WL 1003570, at *8
("Federal officials had punished Navab-Safavi for actions that
were entirely unrelated to her government contract—Navab-Safavi
produced the music video as a private citizen, during non-work
hours, and without using any government resources, making her
First Amendment claim '[unrelated] to the terms of [her]
contract.'  By contrast, Plaintiffs' claims in this case are
wholly bound up with their government contract." (quoting <u>Navab-
Safavi</u>, 650 F. Supp. 2d at 67) (alterations in original)).

vitiate the various statutory schemes that apply to federal employment . . . that have been carefully promulgated by Congress and 'constructed step by step, with careful attention to conflicting policy considerations.'"   Id. at 529 (quoting Bush, 462 U.S. at 388).  The court also noted that its conclusion did not leave the plaintiff without any relief for her injuries as it allowed the plaintiff's Title VII claim and breach of contract claim against the contractor to proceed, both of which relied on the same facts asserted in the plaintiff's proposed Bivens claim.   See id. at 529-30.

     The Court shares the Pollock court's and other courts' reluctance to recognize a Bivens remedy in the federal employment context based on the various statutory schemes that apply to that context.  Furthermore, even though Plaintiff is barred from invoking the CDA's review provisions there is no indication that FSA would be precluded from doing so on Plaintiff's behalf.  Morales argues that "FSA's decision to forego whatever statutory rights it may have had does not entitle [Plaintiff] to pursue a constitutional tort against his former supervisor."  (Defs. Reply at 8.)  On the one hand, that argument ignores both (a) that the AFSC gives the Government the contractual right to require FSA to remove any of its employees; and (b) the practical reality that, even if FSA could resist removal requests made for unconstitutional reasons, a contractor

47

may be reluctant to risk its government contract to defend the
rights of its employees in the hopes of winning a suit under the
CDA.   The fortitude of a government contractor to relinquish a
significant source of revenue may be too slender a reed on which
to rest the protections of the First Amendment, particularly
when Plaintiff contends that his employer not only acquiesced in
the decision to terminate his contract but conspired with the
Government to violate his constitutional rights.[11]   Indeed,
Morales cites no case in which a court has declined to recognize
a Bivens remedy on the ground that Congress had addressed a
comprehensive remedial scheme to a party or class of persons,
natural or corporate, with interests contrary to those of the
plaintiff.

        On the other hand, these concerns are counterbalanced
by the fact that federal contractors adjudged liable for actions
taken at the behest of the Federal Government may be discouraged
from undertaking work upon which the Government depends.   And
that prospect may prompt federal agencies to take steps to
prevent their employees from abusing their authority.   In other
words, the Court is not convinced that protecting speech by
employees of federal contractors requires recognizing a right of

---

[11] As Plaintiff himself points out, "Plaintiff does not merely
allege that FSA failed to challenge his removal from the
contract, but was also complicit in Defendants' decision to do
so."   (Pl. Opp. at 13 n.5.)

action not only against the contractors but against federal employees as well.  The Court finds that the CDA represents a comprehensive attempt to regulate the Government's conduct with respect to its contractors such that recognizing a Bivens action to redress violations of the constitutional rights of those contractors' employees that occur in connection with a government contract would interfere with Congress's purposeful policy judgment not to extend the CDA's protections to the class of individuals that includes Plaintiff.  And in any event, "Congress is in a better position to decide whether or not the public interest would be served by creating it."  Bush, 462 U.S. at 390.

Though the Court need not go further, it notes that additional special factors counsel against recognizing the type of Bivens remedy Plaintiff seeks in this case.  First, Plaintiff ignores "the core holding of Bivens," which is the Supreme Court's amenity to "recogniz[e] in limited circumstances a claim for money damages against federal officers who abuse their constitutional authority."  Malesko, 534 U.S. at 67 (emphasis added).  For example, in Bivens, the challenged conduct involved federal law enforcement agents who, in the course of exercising their federal authority, conducted an illegal search of Bivens's apartment in violation of his Fourth Amendment rights.  See 403 U.S. at 389-90.  Here, in contrast, Morales was not exercising

49

any constitutional authority when he ordered FSA to terminate
Plaintiff's employment.   Rather, he did so pursuant to his
employer's contractual authority under the AFSC.   Because the
allegations in the amended complaint do not directly implicate
Morales's federal authority, this case is different from Bivens
and its progeny in that it does not involve a need to deter
federal actors from abusing that authority.

Another important consideration here is that
Plaintiff's speech concerned a unique subject: fraud against the
Federal Government.   As noted earlier, Congress has enacted a
statute to deal with persons punished for making precisely that
kind of speech, namely, the whistleblower provision of the FCA.
That statute demonstrates Congress has devoted extensive
attention to protecting employees of contractors who expose
fraud against the Government.   Indeed, as discussed supra Part
III.A.2, Congress amended the anti-retaliation provision of the
FCA in 2009 to expand the class of persons protected thereunder.
See Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-
21, § 4(d), 123 Stat. 1617, 1624-25.   True, this case presents
the somewhat unorthodox circumstance wherein Plaintiff claims to
have been exposing fraud by a federal employee rather than his
contractor employer—a problem to which Congress did not,
specifically, address the FCA.   However, the FCA does not
distinguish between persons who expose fraud against the

Government and those who expose fraud in which the Government's
employees are complicit.  The FCA provides both groups of
potential litigants with an action against a private employer
while, for the reasons set forth above, foreclosing an action
against an individual federal employee.  Thus, the Court finds
that because Plaintiff's speech implicates the whistleblower
provision of the FCA—which fails to afford Plaintiff a remedy
against Morales—recognizing a Bivens action on the facts of this
case would essentially permit Plaintiff to circumvent the FCA's
limitations.

Finally, the Court notes that Plaintiff "is not left
without an avenue to pursue" because "he is pursuing claims
against FSA, which has not moved to dismiss." (Defs. Reply at
9.)  Indeed, Plaintiff has both an FCA claim and state law
claims pending against FSA.  The existence of other effective
remedies counsels against recognizing a Bivens action.  See
Malesko, 534 U.S. at 73-74.  Because he has other viable claims
that offer the prospect of recovering damages, Plaintiff is on
the same footing as the plaintiffs in Bush, Schweiker, and
Pollock, all of whom were precluded from pursuing a Bivens
remedy.

Furthermore, the Supreme Court held in Schweiker that
there was no need to recognize a Bivens action where the
plaintiffs "would get precisely the same thing whether or not

51

they were victims of constitutional deprivation." 487 U.S. at 427-28 (internal quotation marks omitted). The same can be said here. Assuming that Plaintiff's allegations are true, the only difference between suing FSA for retaliation under the FCA and bringing a <u>Bivens</u> action against Morales under the First Amendment is who will pay. And in fact, Plaintiff is in some sense better off than the plaintiffs in <u>Bush</u> and <u>Schweiker</u> because the FCA offers him a full panoply of remedies against FSA. <u>See</u> 31 U.S.C. § 3730(h)(1) (entitling an individual who experiences retaliation for reporting fraud against the Government to "all relief necessary to make that" individual "whole"); <u>id.</u> § 3730(h)(2) (listing specific forms of relief available). If limited damages were insufficient to necessitate a <u>Bivens</u> remedy in those cases, a limit on the parties from whom Plaintiff can obtain full relief is insufficient to necessitate a <u>Bivens</u> remedy in this case.[12]

In light of all the aforementioned special factors, the Court declines to recognize a <u>Bivens</u> action and dismisses the claim in Count Four against Morales.

---

[12] The Court also notes that Plaintiff's FCA retaliation claim against FSA carries the potential for greater relief than Plaintiff could obtain under a <u>Bivens</u> claim against Morales, were the Court to permit the latter claim to proceed. That is because Plaintiff's FCA retaliation claim provides the prospect of the equitable remedy of reinstatement whereas a <u>Bivens</u> claim only allows for damages. <u>See</u> <u>supra</u> note 4.

IV.   CONCLUSION

        For the foregoing reasons, the motion of the Moving
Defendants, USMS and Morales, to dismiss all claims against them
[Dkt. No. 15] is GRANTED.  Those claims are dismissed with
prejudice as to the Moving Defendants.[13]  Plaintiff shall confer
with FSA—the lone remaining Defendant in this action—as to
possible dates for a Rule 16 conference and so inform the Court
by letter no later than September 6, 2012.


SO ORDERED.

Dated:    New York, New York
          August 27, 2012

                                    _Loretta A. Presley_
                              UNITED STATES DISTRICT JUDGE

---

[13] The Court denies Plaintiff's request to certify this order for
interlocutory appellate review because it is the Court's opinion
that this order does not "involve[] a controlling question of
law as to which there is substantial ground for difference of
opinion and that an immediate appeal from the order may
materially advance the ultimate termination of the litigation."
28 U.S.C. § 1292(b).  Despite the fact that two of the issues
presented in this order are of first impression in this
district, the Court has resolved those issues in accordance with
the majority of relevant caselaw from other jurisdictions.  The
Court therefore finds that substantial ground for difference of
opinion does not exist on the facts of this case.  Furthermore,
reversal of this order would not terminate this case because
Plaintiff's outstanding claims against FSA offer Plaintiff the
prospect of complete relief.  See Klinghoffer v. S.N.C. Achille
Lauro, 921 F.2d 21, 24 (2d Cir. 1990) (noting that a controlling
question of law exists where the reversal of an order would
terminate an action).  Indeed, the Court's resolution of the
instant motion turns predominantly on the unique facts of this
case.  Accordingly, this order does not involve a controlling
question of law.